ORIGINAL

Approved: _____    **19MAG10127**
JARROD L. SCHAEFFER
Assistant United States Attorney

Before:   HONORABLE JAMES L. COTT
          Chief United States Magistrate Judge
          Southern District of New York

------------------------------------X
                                    :
UNITED STATES OF AMERICA,           :    **SEALED COMPLAINT**
                                    :
          -v.-                      :    Violations of
                                    :    18 U.S.C. § 371
ANTONIO VICTORO CLEMENTE, JR., and  :
SHAWN GABRIEL GIVENS, JR.,          :    COUNTY OF OFFENSE:
                                    :    NEW YORK
          Defendants.               :
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

   ADAM S. ZASTROW, being duly sworn, deposes and says that he is a Special Agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and charges as follows:

## COUNT ONE

### (Conspiracy to Transport Firearms)

   1.   From at least in or about April 6, 2019, to at least in or about April 10, 2019, in the Southern District of New York and elsewhere, ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Sections 922(a)(3) and 924(a)(1)(D).

   2.   It was part and object of the conspiracy that ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, and others known and unknown, not being licensed importers, manufacturers, dealers, and collectors of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully did transport into and receive in the State, where the defendants then resided, firearms, purchased and otherwise

obtained by the defendants outside that State, in violation of Title 18, United States Code, Sections 922(a)(3) and 924(a)(1)(D).

OVERT ACTS

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about April 6, 2019, ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, under different and false names, boarded and traveled on a train leaving from Pennsylvania Station ("Penn Station") in New York, New York, which was bound for Virginia.

    b. On or about April 10, 2019, GIVENS and CLEMENTE, the defendants, under false names, boarded and attempted to travel to Penn Station in New York, New York, on a train leaving from Virginia.

    c. On or about April 10, 2019, GIVENS and CLEMENTE possessed and attempted to transport firearms and ammunition on a train traveling to Penn Station in New York, New York.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I have served as a Special Agent for approximately four years, prior to which I served as a police officer in Alexandria, Virginia, for approximately three years. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports, records, audio recordings, and video footage. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. As set forth in detail below, my investigation to date has revealed that ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, and others known and unknown, conspired to obtain firearms in other states, including Virginia, and to transport those firearms and ammunition back to New York.

6. Based on my participation in this investigation and my review of law enforcement databases, I know that ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, reside in the Bronx, New York.

7. Based on my review of records obtained from Amtrak, I have learned that three tickets for an April 6, 2019 train leaving from Penn Station in New York, New York, and bound for Roanoke, Virginia ("Train-1"), were purchased on or about April 5, 2019, one day prior to Train-1's departure from New York, by a particular individual ("Individual-1"), who resides in the Bronx, New York. In connection with the purchase of those tickets, Individual-1 provided a certain email address ("E-mail-1") as a contact email. Based on my review of records obtained pursuant to a subpoena, I have also learned, among other things, that Email-1 is subscribed to CC-1.

8. Based on my review of surveillance footage obtained from Penn Station, I know that ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, and another co-conspirator ("CC-1") boarded Train-1 together at Penn Station.

9. Based on my review of records obtained from other law enforcement agents, as well as my discussions with those agents, I have learned, among other things, the following:

    a. On or about April 10, 2019, an officer with the Amtrak Police Department ("PO-1") detected the smell of marijuana on board a particular passenger car of an Amtrak train ("Train-2") traveling to New York, New York, from Roanoke, Virginia, which was making a scheduled stop at Washington Union Station in Washington, D.C. ("Union Station"), en route to New York.

    b. During the stop at Union Station, passengers were permitted to disembark from Train-2 for a brief period prior to Train-2 continuing on to New York. PO-1 alerted another officer with the Amtrak Police Department ("PO-2"), who was on routine patrol at Union Station and accompanied by a narcotics detection dog. After Train-2 arrived at Union Station, PO-2 boarded Train-2 accompanied by his narcotics detection dog and a Special Agent ("SA-1") with the U.S. Drug Enforcement Administration ("DEA").

    c. PO-2 and SA-1 walked through the passenger car identified by PO-1. In the vicinity of certain seats in the car, the narcotics detection dog exhibited a change of behavior and showed interest in particular baggage stored in an overhead compartment near those seats, which indicated to PO-2 that the dog detected the presence of narcotics.

3

d. While SA-1 and PO-2 were present on Train-2, two passengers later identified to be ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, boarded the train and sat in the same seats near which the narcotics detection dog had exhibited a change of behavior.

e. SA-1 spoke with one of the passengers in that section, later identified to be CLEMENTE, and requested that CLEMENTE present his boarding pass. CLEMENTE told SA-1, in sum and substance, that he could not provide his boarding pass because his "brother," with whom he was traveling, had his boarding pass.

f. CLEMENTE attempted to contact his "brother," who eventually sent a photograph of the boarding pass to CLEMENTE's phone. CLEMENTE showed the photograph to SA-1, which depicted, among other things, a boarding pass bearing the name "Mike Mike." SA-1 requested that CLEMENTE provide identification, and CLEMENTE provided a New York State driver's license bearing his real name. CLEMENTE was asked why his boarding pass bore a different name and, according to PO-2, CLEMENTE appeared to become nervous.

g. At or about the time that SA-1 spoke with CLEMENTE, SA-1 observed another passenger, later identified to be GIVENS, pacing nearby. GIVENS subsequently sat in the seat across from CLEMENTE. CLEMENTE indicated that GIVENS was one of the "brothers" with whom he was traveling. When asked to provide his name, GIVENS identified himself as "Shawn" and stated, in sum and substance, that his identification was in his luggage.

h. SA-1 requested that GIVENS present his boarding pass. GIVENS told SA-1, in sum and substance, that he could not provide his boarding pass because the same "brother" mentioned by CLEMENTE had his boarding pass as well. Based on my review of records obtained from Amtrak, I know that GIVENS was also traveling with a boarding pass that bore the name "Mike Mike."

10. Based on my review of surveillance footage from Union Station, I have confirmed that ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., appear to have been traveling with a third individual. By comparing surveillance images from Union Station with surveillance images from Penn Station, I believe that CC-1, the person who boarded Train-1 with CLEMENTE and GIVENS in Penn Station, is the same "brother" traveling with CLEMENTE and GIVENS on Train-2. Based on my review of records obtained from Amtrak, I have learned that CC-1 was also traveling with a boarding pass that bore the name "Mike Mike."

4

11. Based on my review of records obtained from Amtrak, I have also learned that all three "Mike Mike" boarding passes used by ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, as well as CC-1, were purchased by a particular individual ("Individual-2") on or about April 9, 2019, one day prior to Train-2's departure from Virginia. When purchasing those tickets for Train-2, Individual-2 provided Email-1 as a contact email, which is the same email address provided by Individual-1 in connection with the purchase of the tickets for Train-1.

12. Based on my review of documents obtained from other law enforcement agents, as well as my discussions with those agents, I have also learned, among other things, the following:

    a. ANTONIO VICTORO CLEMENTE, JR., and SHAWN GABRIEL GIVENS, JR., the defendants, were asked to exit the train and to identify their belongings. CLEMENTE and GIVENS identified several items located together in the overhead storage area near their seats. These items were the same bags near which the narcotics detection dog alerted, and included, among other things, the following: (i) a black jacket ("Jacket-1"), (ii) a gray suitcase ("Bag-1"), (iii) a gray duffle bag ("Bag-2"), (iv) a green camouflage bag ("Bag-3"), and (v) a black-and-red backpack ("Bag-4").

    b. In response to inquiries from law enforcement agents, CLEMENTE indicated, in sum and substance, that he owned Jacket-1 and Bag-1, and GIVENS indicated, in sum and substance, that he owned Bag-2 and Bag-3. Before disembarking from Train-2, CLEMENTE and GIVENS stated, in substance and in part, that Bag-4 belonged to their "brother."

    c. Both CLEMENTE and GIVENS consented to searches of their items. A search of Jacket-1 and Bag-1 yielded two handguns, a black .40 caliber Smith & Wesson semiautomatic pistol ("Firearm-1"), and .380 caliber Smith & Wesson semiautomatic pistol ("Firearm-2"), as well as a box of firearm ammunition. A search of Bag-2 revealed a quantity of green plant material and candy, both of which were labeled "THC," as well as three boxes of firearm ammunition.[1]

---

[1] Prior to the search of Bag-2, the narcotics detection dog had alerted in the presence of Bag-2 on the platform outside Train-2, which indicated to PO-2 that the dog detected an odor of narcotics coming from Bag-2.

    d. SA-1 and PO-2 again inquired regarding the ownership of Bag-4. Contrary to their prior statements, in substance and in part, that Bag-4 belonged to their "brother," both CLEMENTE and GIVENS denied knowledge regarding Bag-4's owner.

    e. Based on my review of surveillance footage from Union Station, I have learned that, at or about the time that SA-1 and PO-2 were speaking with CLEMENTE and GIVENS, CC-1 exited Union Station and left the vicinity.

    f. A search of Bag-4, which was conducted by the Amtrak Police pursuant to Amtrak policy, yielded three additional handguns – a black .40 caliber Glock semiautomatic pistol ("Firearm-3"), a black .380 caliber Glock semiautomatic pistol ("Firearm-4"), and a black-and-white .380 caliber SCCY semiautomatic pistol ("Firearm-5").

  13. Based on my review of law enforcement records, I have learned that the ATF regional Crime Gun Intelligence Center ("CGIC") traced the firearms recovered from the defendants on or about April 10, 2019, and determined that all of the firearms except Firearm-5 were purchased in Virginia by persons other than the defendants. I have also learned that CGIC determined that Firearm-5 was purchased in South Carolina by a person other than the defendants.

  14. Based on other ATF records, I know that none of the firearms recovered on or about April 10, 2019, were purchased by ANTONIO VICTORO CLEMENTE, JR., or SHAWN GABRIEL GIVENS, JR., the defendants.

  WHEREFORE, the deponent respectfully requests that warrants be issued for the arrest of ANTONIO VICTORO CLEMENTE, JR., and

SHAWN GABRIEL GIVENS, JR., the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

_____
ADAM S. ZASTROW
Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to before me this
28th day of October, 2019

_____
HONORABLE JAMES L. COTT
Chief United States Magistrate Judge
Southern District of New York

7